# Richmond.

## COLBERT & KIRTLEY v. SHEPHERD.

### November 17th, 1892.

1. DEDICATION—*Case at bar.*—No particular form or ceremony is necessary to dedicate land to public uses; the assent of the owner, and the fact of the land being used for public purposes, are all that is requisite. In 1789, with the consent and approval of the owner, the body of Mary Washington was interred in a burial lot, and forty-two years later a monument was erected over her grave by an association organized for that purpose. The corner-stone was laid with civic and military ceremonies by the President of the United States. Since then no one has claimed any private ownership over this spot of ground.

HELD:

This constituted a complete dedication of the tomb to public uses.

2. RESERVATIONS—*Option—Case at bar.*—The deed granting to the defendant certain land, containing within its bounds the said burial-ground and monument, reserved both, and defendant never claimed title thereto, but gave plaintiffs an option agreeing to sell a tract " containing about two acres, with the Mary Washington monument and the marble shaft thereon," in which option he used the language quoted merely to describe the tract. The evidence, in an action against defendant for breach of contract, showed that the option was procured by the false pretenses of the plaintiffs, for purposes other than those designed by him.

HELD:

The plaintiffs cannot recover.

3. BROKERS—*Power to sell—Power to buy.*—Where owner constituted certain brokers agents to sell his land at an agreed price on commission—

HELD:

Such agents could not buy for themselves at the price named.

4. IDEM.—Where the option paper left it doubtful whether it gave power to buy as well as to sell, the courts will not infer that the optionee was entitled to become the purchaser.

VOL. LXXXIX—51

Error to judgment of circuit court of city of Fredericks-
burg, rendered March 28th, 1891, in an action of covenant
wherein Joseph W. Colbert and William F. Kirtley, partners
under the name of Colbert & Kirtley, were plaintiffs, and
George W. Shepherd was defendant.  The judgment being
adverse to the plaintiffs, they obtained a writ of error to this
court.    Opinion states the case.

*A. H. Dickinson* and *John Lyon*, for plaintiffs in error.

*Marye & Fitzhugh*, for defendant in error.

FAUNTLEROY, J., delivered the opinion of the court.

The form of the suit is an action for damages for the
alleged breach of a written contract, declared upon and made
profert of in the declaration ; to which there was a demurrer,
overruled by the court.    The jury, upon the evidence set
forth in the record, and under instructions given by the court,
after refusing to give instructions asked for by the plaintiffs,
found a verdict for the defendant.    The plaintiffs moved the
court to set the verdict aside and grant to them a new trial,
upon the ground that the verdict was contrary to the law and
the evidence ; which motion the court overruled, and entered
judgment for the defendant in accordance with the verdict.

The record in this case presents for review by this court
the sacrilegious and shockingly shameful spectacle of a con-
troversy and traffic over the grave and sacred ashes of *Mrs.
Mary Washington*, the honored and revered *mother* of the
transcendent *man* of all the ages, who, in the annals of the
world, is without a prototype, a peer, or a parallel.    Mary, the
mother of Washington, a deeply pious, intellectual, resolute
woman, refused to surrender her supremacy by residing with
any of her children, and chose to live by herself on her farm

in Stafford county, opposite Fredericksburg, surrounded by her slaves and domestics, in the exercise of her systematic and beneficent authority; until her illustrious son urged upon her his solicitude for her personal safety, and his apprehension that the capture of her person, by the enemies of her country, to be held as a hostage, might some time constrain him, as the commander-in-chief of the revolutionary patriots, to elect between public duty and filial affection. She removed to the village of Fredericksburg, on the south side of the Rappahannock river, and resided there from 1776 to 1789, in a plain wooden structure, framed and weather-boarded, within three squares of the " *Kenmore* " residence of Col. Fielding Lewis, the husband of her daughter, *Betty.* There, at the age of eighty-three years, on the 25th day of August, 1789, she died, and was buried on the apex of a hill which overlooks the valley of a little stream of water, which, on the western side of Fredericksburg, winds its way to the Rappahannock river. There, tradition says, she resorted frequently, during her fourteen years of solitary life, for meditation and prayer, and sat, often for hours, upon the ledge of rocks that crops out on the top of the hill; and that she gave directions to be buried there, on the land, then the property of her son-in-law, Col. Fielding Lewis. About the year 1831, forty-two years after Mrs. Washington was buried, an *association* was organized to erect a monument to her memory over her grave; and *General Andrew Jackson,* the renowned President of the United States, who had been compatriot in arms with her great son, and whose youthful blood had been shed in the revolutionary war—the independence of their common country—was invited to lay the corner-stone.

And, on the 7th day of May, 1833, with civic ceremonies and military pageant worthy of the occasion, the venerated chief magistrate of the United States, who, the illustrious *Thomas Jefferson* said, " had filled the measure of his coun-

try's glory," in the name and in behalf of all the people of this great country, performed the signal act of public gratitude and affection, and laid the corner-stone of the monument which marks the grave of the *mother* of the "father of his country "; and thus, in the most solemn and impressive manner, dedicated to public and pious uses forever the consecrated spot where the remains of this honored woman had reposed for forty-five years, in the grave where the pious duty and reverence of her children had laid her. From that day to this no right or claim of private ownership has ever been exercised over it, or made to it.

In *Beatty* v. *Kuntz* Judge Story said : " It [the lot] was originally consecrated for a religious purpose. It has become a depository of the dead, and it cannot now be resumed by the heirs of Charles Beatty." In *Cincinnati* v. *White* the court said : " There is no particular form or ceremony necessary in dedication to public use. All that is required is the assent of the owner of the land, and the fact of its being used for public purposes." *Beatty* v. *Kuntz*, 2 Peters 556 ; *Cincinnati* v. *White*, 6 Peters 186.

In the appropriate and elegant address made by Mr. Bassett, chairman of the monumental committee, to the President of the United States, at the laying of the corner-stone of the monument, he said : " In looking upon this monument, the citizens of these states will remember that they are brothers. They will remember that here lie the ashes of the ' mother of the father of his country.' They will acknowledge, too, this just tribute to the merits of her who, early deprived of the support of her consort, encouraged and fostered, by precept and example, the dawning virtues of her illustrious son, and nurtured into maturity those nobler faculties which were the ornament and glory of her waning years. They will acknowledge the hallowed character of this romantic spot, ever to be remembered as the place chosen for her private devotions.

Here she asked, as a dying request, that her mortal remains might rest. Hallowed be this wish! Sacred this spot! Lasting as time this monument! Let us cherish the remembrance of this hour. Let us carry with us hence, engraved on our hearts, the memory of her who is here interred. Her fortitude—her piety—her every grace of life—her sweet peace in death—through her sure hope of a blessed immortality."

To this President Jackson responded, in an address exquisitely beautiful and justly proportioned to the great occasion and the mighty theme; in the conclusion of which he said: " It is to me a source of high gratification that I can speak of him from personal knowledge and observation. I witnessed the public conduct and private virtues of Washington; and I saw and participated in the confidence which he inspired, when probably the stability of our institutions depended upon his personal influence. In the grave before us lie the remains of his *mother*. Long has it been unmarked by any monumental tablet; but not unhonored. You have undertaken the pious duty of erecting a column to her memory, and of inscribing upon it the simple but affecting words: " Mary, the Mother of Washington." No eulogy could be higher; and it appeals to the heart of every *American*. Fellow citizens, at your request, and in your name, I now deposit this plate in the spot destined for it; and when the American pilgrim shall, in after ages, come up to this high and holy place, and lay his hand upon this sacred column, may he recall the virtues of her who sleeps beneath; and depart with his affections purified and his piety strengthened, while he invokes blessings upon the memory of the Mother of Washington."

This proud history has been recited, *arguendo*, to show that the hallowed tomb of *her* who gave to the country and to humanity the foremost man on the files of Time, has been consecrated, by private dedication and by public ceremonial,

as the *peculium* of patriotic pride and protection ; and could not be made the subject of legitimate contract, much less of venal and vulgar traffic. Lord Brougham, the great English chancellor and philanthropic statesman, said : "Until time shall be no more will a test of the progress which our race has made in wisdom and virtue be derived from the veneration paid to the immortal name of Washington." And Washington himself, in the fulness of his matchless fame, said : "*All that I am I owe to my mother !*"

By a deed made on the 13th day of April, 1888, and duly recorded in the clerk's office of the corporation court of Fredericksburg, Brodie S. Herndon and his wife granted and conveyed to George W. Shepherd all their right and title to the lot of ground numbered (25) twenty-five on the map of the "Kenmore" estate, containing one acre, one rood, and six poles of land, and which includes within its limits the family burying-ground and monument ; "but it is expressly stipulated and agreed that the said family burying-ground and monument are not included in this grant, but *excluded* therefrom ; and is the same lot or parcel of land as conveyed by deed by William K. Gordon to Brodie S. Herndon, Jr.; in deed of the 13th day of May, 1881, and recorded in the clerk's office of the corporation court of Fredericksburg, Va., on that date."

Which said deed of May 13th, 1881, from William K. Gordon to his son-in-law, Brodie S. Herndon, grants "unto the said Herndon the lot of ground numbered 25, on the map of the 'Kenmore' estate, containing one acre, one rood, and six poles of land, and which includes within its limits the family burying-ground and monument. But it is expressly stipulated and agreed that the said family burying-ground and the said monument are not to be included in this grant, but excluded therefrom."

The testimony in the record shows that the deed from Hern-

don and wife to George W. Shepherd was in Shepherd's handwriting, copied by him from the deed of Gordon to Herndon; and that the said George W. Shepherd, defendant, never claimed more than was conveyed to him by the said deed, and never claimed to own the monument or the grave of Mary Washington; and that he used the words, "with the Mary Washington monument and large marble shaft thereon," as merely descriptive of the lot of land. That there was and is on the lot No. 25 aforesaid no monument except the Mary Washington monument, which is located within two feet of the brick wall of the Gordon family burying-ground; that the option contract signed by the defendant, and dated February 28th, 1889, referred only to the property he bought from Dr. Herndon—no more, no less—and that property was universally known and designated as the "Mary Washington monument lot"; that the option was given by the defendant to the plaintiffs at their request, without any consideration therefor, only to furnish a description to swell their *catalogue*, which they said they intended to publish as real estate agents, but which, in fact, they never did issue or publish, and which, their subsequent conduct shows, was a device and false pretense to procure from G. W. Shepherd a paper given to them for one purpose, but which they fraudulently perverted to another and a different purpose, and have made the foundation for a suit for damages.

On the 27th day of February, 1889, the defendant, George W. Shepherd, a wealthy citizen of Fredericksburg, of advanced age, and of the highest standing in business and society, approached the plaintiff, William F. Kirtley, whom he only knew by sight, on the street in Fredericksburg, and said to him that, having been told that he (Kirtley) had opened a real estate business in Fredericksburg, he thought that he might help to find purchasers for some land belonging to the Chancellor estate, and that he also had some lots that he

would sell. Kirtley desired Shepherd to show his said lots to him, and on that day (February 27th, 1889,) they visited the Kenmore lots, one of which was known and designated as the " Mary Washington monument lot." Kirtley said that Colbert & Kirtley were about to publish a catalogue of land for sale in Fredericksburg and vicinity, and would like to swell it ; and asked Shepherd if he would agree to give an option on his said lots, and at what price he would sell them. Shepherd replied that he would let him know, and that same day, after dinner, Kirtley called at Shepherd's office, and Shepherd gave to him two written papers, as follows :

" [*Private.*]

" FREDERICKSBURG, VA., }
February 27th, 1889. }

" *Mr. Kirtley,*—I herewith hand you *a memorandum of the price* for the *monument lot* and adjoining lot, and will allow you a commission on the *monument lot* of ten per cent., and allow you a commission on the adjoining lot of ten per cent. This property can probably be marketed, by a syndicate, at a much higher figure than I *now* ask ; and, if Congress makes the appropriation for the monument, the new owners could dictate terms that would pay handsomely for their investment.

" Very truly,

" G. W. SHEPHERD."

" FREDERICKSBURG, February 22d, 1889.

" I will sell the lot containing about two acres of land, with the Mary Washington monument and large marble shaft thereon, for the sum of twenty-five hundred dollars. I will sell the lot adjoining the *monument lot*, containing about ten acres, for the sum of five thousand dollars, and will give to Messrs. J. W. Colbert and. W. F. Kirtley a sixty-day option on these two pieces of property at the prices named.

" G. W. SHEPHERD."

After receiving the aforesaid two papers, Kirtley went away with them ; and, afterwards, during that same afternoon, he sent Shepherd the following letter :

"J. W. Colbert.                          Wm. F. Kirtley.

"COLBERT & KIRTLEY,

"Real Estate Agents and Auctioneers.

"FREDERICKSBURG, VA., February 27th, 1889.

"*Mr. G. W. Shepherd :*

"Dear Sir,—There is *one little error* in the papers you gave me this morning, which might have to be corrected here-after ; so I have concluded to call your attention to it now, and would like to have it in proper shape before north-bound mail this 8:47 P. M.   Please call at my place of business as soon as you get this, or let me know what time to meet you at your place.

"Yours truly,

"WM. F. KIRTLEY."

"N. B.—Should you call and I am out, please leave word with Mr. Colbert what time I can see you.

"W. F. K."

On the same afternoon of February 27th, 1889, Mr. Kirtley brought to the place of business of Mr. Shepherd, and handed to him, the written paper, in Mr. Kirtley's handwriting, down to the words and figures "February 28th, 1889," inclusive, as follows :

"I agree to give Messrs. J. W. Colbert and William F. Kirtley a sixty (60) day option on the lot containing about two acres of land, with the Mary Washington monument and large marble shaft thereon, for the sum of twenty-five hundred dollars.   And I further agree to give the same length of

time on the lot adjoining, containing ten acres of land, for the sum of five thousand dollars. And the said option shall be in full force from this date, February 28th, 1889." (To which, at the request and dictation of Mr. Kirtley, Mr. Shepherd added): "And they (Messrs. Colbert & Kirtley) have full authority to sell said property at the price named above, and will make title to same when sold.

'                    " G. W. SHEPHERD."

The evidence in the record shows that these *three* papers, dated, respectively, February 22d, February 27th, and February 28th, were all written, signed, and delivered on the 27th day of February, as parts of one transaction, and were so given by Shepherd to Colbert & Kirtley, as real estate agents and auctioneers, for insertion in their pretended-to-be forthcoming catalogue ; and that Mr. Shepherd, having thereby constituted Colbert & Kirtley his agents to *sell*, they could not *buy* for themselves at the price named, unless they satisfied him that they were not in possession of, or could not obtain, a better offer. It is a general rule of law, as well as of morals, that an *agent* to *sell* cannot *buy ;* and the import of the three papers given by Shepherd to Messrs. Colbert & Kirtley is nothing more than a permission, asked for by Kirtley, to insert a description of the lots in their proposed catalogue, for sixty days, at the prices named ; and agreement, on Shepherd's part, that, in the event of a sale of the lots at those prices, the commission of ten per cent. would be allowed. All three of the papers, written, signed, and delivered the same day, in relation to the same subject, and as parts of the same transaction, must be read together and in the light of the paper of February 27th, 1889, marked "*Private*," and as explained by the *uncontradicted* testimony as to the object and purpose in view in giving them. The undisputed fact is, that these papers, containing the " option," were given to a firm of land

agents as authority to *sell* these lots, and that they did, as said agents, so advertise them for sale; and, even though the language of the papers and the evidence left it doubtful whether the option was to *buy* as well as to *sell*, the law would not infer that an agent to sell could, himself, become the purchaser. Story on Agency, section 210. In section 211 Judge Story says: " It is well settled that an agent, employed to sell, cannot himself become the purchaser; and an agent employed to *buy* cannot, himself, be the *seller*." In *Farnsworth* v. *Hemmer*, 1 Allen 494, Bigelow, C. J., said: " A man cannot become the purchaser of property for his own use and benefit which has been intrusted to him to sell." See *Wadsworth* v. *Adams*, 138 U. S. R. 380; 129 U. S. 663; Story's Equity, Vol. I., sections 307, 315; *Lamar* v. *Hale*, 79 Va. 158; 25 Gratt. 40.

The transaction between Colbert & Kirtley and the defendant, Shepherd, whether viewed in the light of the well-settled principles of law applicable to the relation of *principal* and *agent*, or of the undisputed testimony in the record, shows that the plaintiffs were his agents to advertise and sell his lots, and that, as such, they could not become the purchaser of them, or of either of them; and, independently of the other questions to be considered, the attempt to obtain the title in and for themselves was a fraud upon the defendant.

But the plaintiffs themselves construed the so-called " option " as being only an authority to them to sell the lots as *land agents;* and they advertised them for sale as land agents. On the 28th day of February—the very next day after the paper sued upon was signed and delivered to them— there was published in the *Free Lance* newspaper, in Fredericksburg, an *interview* had with Messrs. Colbert & Kirtley, in which they said: " Yes, sir; we have the property in hand for sale, and will offer it, at public outcry, in the city of Washington, on the 5th of this month (March).

There being no disposition on the part of either Congress or people to finish the monument, or to care for the grave of Mrs. Washington, and feeling the general depression of all kinds of business, and to enliven up things, we have determined to sell graves, if, by so doing, we can attract the attention of the country to this locality, and bring money here from other sections. We have ordered the *Post*, at Washington, to insert the following advertisement for us; and, if parties will purchase, we mean to sell. The title to the land and *all there is on it—above* and *below*—will be made perfect to the purchaser. We think it would be better than Libby Prison to some northern relic-hunter, and, thinking the opportunity a favorable one to offer the property, we have decided to do so in the manner described. As real estate agents, we mean business in this, and in all other matters. The property *is in our hands for sale,* and we mean to sell it, if possible, at the time and place designated."

### The Advertisement.

" The Grave of Mary, the Mother of General George Washington, to be Sold at Public Auction.

" *To the Ladies Attending the Inauguration of President-Elect Harrison :*

" On Tuesday, the 5th of March, 1889, at 4 o'clock P. M., we will offer for sale, at public outcry, at the capitol of the United States of America, twelve acres of land, embracing the grave and the material of the unfinished monument of Mary, the mother of General George Washington.

" Colbert & Kirtley,
" Real Estate Agents and Auctioneers.

" Fredericksburg, Va."

On Saturday morning, the 2d day of March, 1889, Hamp-

ton Merchant said to Mr. Kirtley: " I notice that you have advertised to sell the Mary Washington monument. You can't do it. I have examined the records, and find that the *monument* is reserved in the deeds; and neither Mr. Shepherd nor you have any right to sell it." Mr. Kirtley answered : " I propose to sell it." To which Merchant replied : " The hell you do! You can't do it." To which Mr. Kirtley rejoined : " I propose to sell according to the option."

After 2 o'clock P. M. on Saturday, the 2d · day of March, after Kirtley had had the interview with Merchant, above detailed, and information of the recorded deeds, which showed the express reservation and exclusion of the *monument* from the title to the lot conveyed to G. W. Shepherd, Messrs. Colbert & Kirtley had printed, at the office of the *Free Lance* 2,000 copies of a *hand-bill*, as follows :

" GENERAL GEORGE WASHINGTON.

" The Tomb and Unfinished Monument of Mary,
His Sainted Mother.

" On Tuesday, the 5th inst., at 4 o'clock P. M., at the capitol of the United States of America, under authority vested in us by the " *real* " owners of the property, we will offer for sale, at public outcry, about twelve acres of land, situate within the corporation of Fredericksburg, embracing the grave of Mary, the mother of General George Washington, and also the material of her unfinished monument. At the same time and place we will offer, to the highest bidder, the house in which she lived and died, and within eight squares of the tomb.

" COLBERT & KIRTLEY,
Real Estate Agents,
Fredericksburg, Virginia."

The plaintiffs, Colbert & Kirtley, had printed and circulated, in 2,000 atrocious hand-bills, a false statement, known to them to be absolutely and positively false, obviously as a part of their predication for their suit against Shepherd, for damages for his refusal to sell and convey to them (his agents), with warranty of title, what he did not own, and had never claimed, and what the records and common fame of the country explicitly informed them he had no title whatever to.

As soon as Mr. Shepherd got the first intimation of the shocking advertisement in the *Post* and hand-bills, he sought to find Kirtley, who had gone to Washington city, and he sent to him a letter, dated Fredericksburg, Va., March 3d, 1889, Sunday, P. M.

" *Mr. Kirtley,*
                *Washington, D. C.:*

"Dear Sir,—I understand you are using *my name* as the *owner* of the Washington monument, and that a deed will be given for same by me. *This, as you are aware, is not correct, as I have never set up any claim to the ownership of the monument,* and have no deed for it, and cannot convey what I do not own. In offering the land let nothing be misunderstood, and only sell the land conveyed to me by Herndon and others. Neither do I own the ' Gordon burial-lot,' in the same field, and the right to the family is reserved to continue using the same if they so desire.
                                "Very truly,
                                        " G. W. SHEPHERD."

On the 4th of March, 1889, he promptly served on Colbert & Kirtley the following notice :

" *Messrs. Colbert & Kirtley,*
                *Fredericksburg, Va.:*

" Gentlemen,—I notice, by the hand-bill you have issued,

advertising twelve acres of the Kenmore farm for sale, in Washington, D. C., on the 5th of March, 1889, that the language you employ is calculated to produce the impression that you will sell the grave of Mary, the mother of Washington, and the material of her unfinished monument. I hereby notify you that I do not own, or claim to own, said grave or monument, and your advertisement of the same for sale is wholly unauthorized. I further notify you that the proposed offer of said twelve acres of land at '*public auction*' is wholly unauthorized, and I protest against the same.

" Very respectfully,

" G. W. SHEPHERD."

The record shows the indignant outburst of reprobation with which the citizens of Fredericksburg, in public meeting, denounced the outrage upon public sensibility by advertising to sell, at public outcry, the grave of Mrs. Washington ; and the action of the city council declaring the proposal to be " a scandalous reflection upon a civilized Christian community."

And Mr. Shepherd himself says : " I had never in my life read or heard of traffic in graves and the monuments that marked them ; and I must confess that I did not dream that it could enter into the imagination of man to make merchandise of the remains of Mary, the mother of Washington, or that any sane man could be bribed to offer them at auction. I had no title to the monument, and I knew I had none, and my deed of record proclaimed to the world that I had none. I gave no authority to any one to offer my lots at auction, and nothing contained in said papers given Colbert & Kirtley could be so construed. I attached but little importance to the option when I gave it (for insertion in their proposed catalogue) ; and certainly no one, not a prophet, could have foreseen the use that was sought to be made of it, and its utter perversion from a simple authority to sell two lots, given,

by the owner, to a firm of land agents, into a sensational scandal and reproach upon the community and the *nation*."

On the 12th of March, 1889, Colbert & Kirtley published a *card* to vindicate themselves, in which they say : " Mr. Shepherd put *this lot in our hands for sale*." " Had Mr. Shepherd come to us when first informed of our intention to put this property upon the market, and made the statement he did in his card (of the 8th), &c., &c., we, doubtless, would have consented to release him from the contract," &c. And, yet, these land agents of Mr. Shepherd to sell his lots, for a commission, tender to him, on the 13th day of April, 1889, $2,500, and say : " Our Mr. Kirtley will hand you the cash upon the delivery of the deed, properly executed by you and your wife." Which deed, prepared by themselves, was a deed *to themselves* (Colbert & Kirtley), conveying the monument lot (No. 25) *and the monument and shaft*, with an express covenant in the deed that George W. Shepherd *had the right to convey the monument* and *shaft*, and expressly granted the *monument* and *shaft* in addition to the *lot*.    And the declaration in this suit alleges that George W. Shepherd, the defendant, promised and agreed to sell to the said plaintiffs, Colbert & Kirtley, a certain lot of ground in Fredericksburg, Virginia, containing two acres of land, *together* with the Mary Washington monument and large marble shaft on said lot, for the sum of $2,500 ; and that the said plaintiffs, Colbert & Kirtley, were ready and willing to perform, &c., and to pay the said sum of $2,500 for the said lot of ground and monument and shaft, and to complete the purchase thereof ; and requested that he, the defendant, should then and there execute and deliver to them a conveyance of, and to make title to, the said lot of ground, *and* monument *and* shaft.

Without a further recital of the details of this horrid transaction, stamped all over with the fraud, false pretense, and deceit of the plaintiffs in error, we are of opinion that,

upon the pleadings and evidence in the record, the verdict of the jury is plainly right; and that the circuit court of Fredericksburg did not err in refusing to set the verdict aside, and in entering judgment thereon. The judgment complained of is right, and it is affirmed.

JUDGMENT AFFIRMED.