# CHARLESTON.

STURMER v. COUNTY COURT OF RANDOLPH COUNTY et al.

Submitted September 9, 1896—Decided December 9, 1896.

1. DEDICATION—PUBLIC SQUARE.

A public square in a town or village, which for more than eighty years has been treated as such by the county court of the county, has been recognized as such by the municipal authorities of the town, and used as a public square by the court and the public generally, must be considered as dedicated as a public square for the use of the public.

2. DEDICATION—PUBLIC SQUARE—MISUSER.

The county court of the county, being desirous of erecting a jail, having as early as November, 1813, agreed with a party fronting on such public square that in consideration of the conveyance of a lot for such new jail to be erected upon, no public building shall be erected on such public square in front of said party's house, can not, after said public square has for so many years been dedicated to the public, and accepted as such, sell the same to private parties for the erection of private buildings, and the party owning property as aforesaid fronting on such public square may restrain the erection of private buildings thereon by injunction.

W. T. ICE and L. D. STRADER for appellants.

I.—*Dedication by act of party (without deed).*—9 W. Va. 215; 33 W. Va. 507; 1 Robinson, 198.

II.—*Intention to make dedication by contract or otherwise.*—5 Am. & Eng. Enc. Law, pp. 400, 401, note 1.

ENGLISH, JUDGE:

This was a suit in equity, brought by Valeria S. Sturmer, who sued on her own behalf and all the other taxpayers of Randolph county, against Warwick Hutton, Patrick Crickard, L. D. Greynolds, and F. J. Smith, in the Circuit Court of Randolph county, on the 16th day of May, 1895. The plaintiff, in her bill, alleges that she is the owner in fee simple of a certain lot in the town of Beverly, whereon is situated a large hotel building, which has long been known first as the Leonard and then as the Valley House; that said house is situated directly on Water street, and that between it and Main or Jacob street there is situated a small lot of ground, and that the frontage of said hotel has always been towards the said Main or Jacob street upon said lot of ground; that her title has been derived from one Adam Myers, who was the fee-simple owner thereof in the year 1813, and of some land adjoining said hotel property on the north side thereof, upon which the jail was erected. In the year 1813 the county authorities had already located and erected the county court house upon the southern end of a piece of ground which they then claimed to own which included the lot of ground in front of said hotel property on Main or Jacob street, which they claimed to have been donated to them for public purposes. At that time no permanent jail building had been erected for the use of said county, and the county court was considering the erection of a county jail upon said piece of ground in front of said hotel property. Said Myers, who was then the owner of the hotel property, objected to the erection of the jail on said lot, and, in order to avoid it, proposed to convey to the said county a sufficient lot of ground below and northward for said jail purposes, and there was an order of the county court of said county, a copy of which is filed with the deposition of George W. Printz, in said cause, "at a county court held for the county of Randolph on the 24th day of November, 1813, it was ordered that William Marteny and William Steer be appointed commissioners to contract with Adam Myers for land to build a jail on, and to enter into an agreement with said Myers that the public will put no

buildings on the public square unoccupied opposite said Myers House, but it to remain for the use of the public." The commissioners so appointed did contract and agree with said Myers that said Myers should convey to said commissioners, for the uses of the county jail, said lot northward of said hotel property and public square now known as the "Leonard Storehouse property," upon which the said jail was to be erected (and was subsequently erected) and that said piece of ground in front of said hotel property and between it and the said Main or Jacob street should be forever dedicated to the public for public uses, to remain open, uninclosed, and no public buildings to be erected thereon, and that as a guaranty that this should be carried out in good faith the said commissioners for said county were to convey an undivided moiety in said public square to said Myers (for that both the said county court and the said Myers were equally interested in the dedication and maintenance of said ground as a public square). On the 25th day of November, 1813, this contract was consumated by a deed executed by said Myers and William Marteny, one of the commissioners on behalf of the county court, a copy of which is exhibited, and reads as follows:

"This indenture, made this 25th day of November, 1813, between Adam Myers and Mary Myers of the county of Randolph, of the one part, and William Marteny and William Steer, commissioners appointed by an order of the county court of Randolph county, at the November term, 1813, to contract with the said Myers for ground to build a public jail on, of the other part, witnesseth, that the said Adam Myers and Mary Myers, for and in consideration of the sum of one dollar, as well as one moiety of the public ground opposite to and in front of said Myers House, so far as the said public ground is not to be occupied by public buildings, to them by the said William Marteny and William Steer in hand paid, the receipt whereof the said Adam Myers and Mary Myers hereby acknowledge, have granted, bargained, sold, and confirmed, and by these presents doth grant, bargain, sell and convey, unto the said William Marteny and William Steer, commissioners for the said court, a certain lot of land containing one-half quarter

of an acre, lying and being in the town of Beverly, adjoining of the public ground, being part of lot known on the plan of said town by 'No. 5'; to have and to hold said lot or parcel of land, with the appurtenances thereto belonging, to them, the said commissioners for the use of the said court and their successors, to the only proper use and behoof of the said court and their successors forever; and the said Adam Myers and Mary Myers for themselves, their heirs, executors, and administrators, doth hereby covenant and agree with the said commissioners that they, the said Adam Myers and Mary Myers, and their heirs, *etc.*, the said lot or parcel of land, with its appurtenances, to them, the said commissioners, against them, the said Adam Myers and Mary Myers and their heirs, and against all persons whomsoever, shall warrant and defend. In witness whereof the said Adam Myers and Mary Myers have hereunto set their hands and fixed their seals, the day and year above written.

"ADAM MYERS.      [Seal.]
                          [Seal.]
"WILLIAM MARTENY.  [Seal.]
                          [Seal.]

"Signed, sealed, and delivered in presence of ———."
—Which deed appears to have been duly recorded in said county. The plaintiff also alleges that this contract was faithfully performed and carried out by the then county court and its successors in office, and said lot was delivered to the public as a public square or common, and from the 25th day of November, 1813, until some time in 1890, a period of over three-fourths of a century, said dedication of said piece of ground for a public square or common was universally recognized, and said ground was permitted to remain uninclosed, without buildings, and was constantly used by the public officers of said county as a place of sales, and by said Myers, his vendees, and the public generally as a public square or common, and was universally recognized, accepted, and used by the public as such. The plaintiff further says that if the said county court did have an unqualified fee simple in said ground, by said contract with the said Myers, and by its clear acts of

dedication aforesaid, it lost the same, and such fee-simple title, so far as in contradiction of said dedication and its right to hold said property as trustee for the use and benefit of the public aforesaid, and lost all right and power to sell and dispose of said property to private individuals to be used for private purposes.

But the plaintiff charges that the defendant, the county court, determined to erect a new courthouse upon an entirely different lot or piece of ground in the town of Beverly, purchased for that purpose, and afterwards determined, in direct violation of the rights of the public, and of the heirs of said Myers, and in the face of the long continued use by dedication and acceptance of said public square or common, to attempt to sell a fee simple title to said public square or common; and in pursuance of said unlawful purpose entered certain orders of record directing a sale of the same, and certain commissioners, in accordance with said orders, did attempt to sell the same in connection with the old courthouse, at which pretended sale the defendants Greynolds, Hutton, and Crickard became joint purchasers thereof; and, after a pretended compliance with the terms of sale, they, the said Hutton, Greynold, and Crickard, as plaintiff charges, in violation of law and the vested right of the public, took unlawful possession of said public square, and erected a fence around the same, which has been maintained continuously until a few days ago, when a portion of the same was removed, and about one-half of the said lot was thrown open again; and it was publicly announced that the said Greynolds, Hutton, and Crickard have sold said portion to the defendant Smith, and that said Smith would erect thereon a large three-story frame business building fronting on Main or Jacob street, and with the rear thereof coming up directly to the porch in front of said hotel property so owned by the plaintiff, whereby the front entrance of said hotel property will be almost entirely destroyed, the light of the front rooms of said hotel would be almost entirely destroyed, and other special and irreparable damage would be done to the plaintiff, and the value of said property greatly depreciated; and in pursuance of this unlawful design and pur-

pose have already gone actively to work and commenced digging the trench for the foundation of said building, and literally covered said ground with stone for the foundation of said building, and is continuing daily active preparations for and work upon the erection of said building; that the erection of said building will destroy the public uses and enjoyment of said ground; and she exhibits her chain of title from Adam Myers to herself; and she prays the removal of said fence and stone from said lot as a nuisance, and the restoration of said ground to the public use and enjoyment to which it had so long been dedicated, and that the defendants be enjoined and restrained from erecting or maintaining any buildings, fences, or other obstructions or nuisances upon said grounds; that they be required to remove therefrom all such fences, building stone, and material placed thereon, and that all conveyances and contracts which have been made by said defendants from one to the other, whereby it has been sought to vest in any one a fee-simple title in and to said lot, or any part of it, for private use, be set aside, and be declared null and void, as clouds upon the public rights to the use and enjoyment for public purposes of said lot for common aforesaid; and that said public use and enjoyment therein be restored, *etc.* Answers were filed by the defendants, putting in issue the material allegations of the bill. Several affidavits were filed by plaintiff, and numerous depositions were taken and filed by both plaintiff and defendants.

On the 21st day of June, 1895, a motion was made in vacation to dissolve the injunction awarded in this cause, which was overruled, and on the 17th day of October, 1895, the cause was finally heard, the injunction was perpetuated, and the defendants were required in sixty days to remove the fences and building stone from said lot, and said lot was declared to have been dedicated to the uses set forth in plaintiff's bill, and all conveyances and contracts which had been made by the defendants from one to the other, whereby it had been sought to vest in any or either of them a fee-simple title in and to said lot, or any part of it, for private use, were set aside, and declared null and void,

as clouds upon the public right, to the use and enjoyment for public purposes of the lot or common aforesaid; and the public use and enjoyment thereon was in all respects restored as theretofore, and the defendants Hutton, Crickard, and Greynolds appealed.

The first error assigned and relied on is that "it was error to hold that the said lot of ground had ever been dedicated to the public by the county court of Randolph county, or by any other person, because there is no proof in the cause sufficient to establish the fact of such dedication." Anderson, in his valuable Dictionary of Law, defines "Dedication" as "the appropriation to public uses of some right or property, as the dedication of a highway, landing, square, park, land for school purposes," *etc.* "The act of giving or devoting property to some public use, an appropriation of realty by the owner to the use of the public, and the adoption thereof by the public, as the dedication of soil for a highway, has respect to the possession of the land, not to the permanent estate, express when explicitly made by oral declarations, deed, or vote, implied when there is acquiescence in a public use." In 5 Am. & Eng. Enc. Law, p. 416; under the word "dedication," we find it stated that dedication by the common law was confined to the purpose of highways, but in this country the doctrine has a wider application, and its limit has been judicially defined to extend to public squares, common lots, burying grounds, school lots, and lots for church purposes and pious and charitable uses generally, and in many cases where the use was either expressly or from the necessity of the case limited to a small portion of the public. Public squares were very early recognized as a legitimate public use, and the same rules of law are applicable to the dedication of public squares as to the dedication of highways.

In the celebrated case of *City of New Orleans* v. *U. S.*, 10 Pet. 662, the question was whether certain land lying between Water street and the river, which had been used for commercial purposes as a wharf, was public property, as having been dedicated for the purpose, or whether it could be divided up and sold to private parties for private purposes. In that case it was held that: "In order to dedi-

cate property for public use in cities and towns and other places, it is not essential that the right to use the same shall be vested in a corporate body. It may exist in the public, and have no other limitation than the wants of the community at large." So in the case of *City of Cincinnati* v. *White's Lessee,* 6 Pet. 431, it is held that: "Dedications of land for public purposes have frequently come under the consideration of this court, and the objections which have been raised against their validity have been the want of a grantee competent to take the title, applying to them the same rule which prevails in private grants—that there must be a grantee as well as grantor. But that is not the light in which this court has considered such dedications for public use. The law applies to them rules adapted to the nature and circumstances of the case, and to carry into execution the intention and object of the grantor, and secure to the public the benefit held out and expected to be derived from and enjoyed by the dedication. There is no particular form of ceremony necessary in the dedication of land to public use. All that is required is the assent of the owner of the land, and the fact of its being used for the public purposes intended by the appropriation." And, after speaking of the dedication of streets it is held: "But the principle, so far as respects the right of the original owner to disturb the use, must rest on the same ground in both cases, and applies equally to the dedication of the common as to the streets. This was for the public use, and the convenience and accommodation of the inhabitants of Cincinnati; and doubtless greatly enhanced the value of the private property adjoining this common, and thereby compensated the owners, for the land thus thrown out as public ground. And, after being thus set apart for public use, and enjoyed as such, and private and individual rights acquired with reference to it, the law considers it in the nature of an estoppel *in pais,* which precludes the original owner from revoking such dedication. It is a violation of good faith to the public and to those who have acquired private property with a view of the enjoyment of the use thus publicly granted." Again, in 5 Am. & Eng. Enc. Law, in a note on page 416, the law is stated thus. "An open

square in a town may be dedicated to the public by its owner, and a formal acceptance by the town is not necessary to make the dedication complete. Acceptance will be pre sumed if the gift is beneficial, and user is evidence that it is beneficial. No particular length of time is necessary to make a dedication binding." So, in the case of *Hunter* v. *Trustees*, 6 Hill, 407, it was held that "no deed or other writing is necessary to constitute a dedication. Nor is lapse of time an essential ingredient, but the dedication may be established by acts on the part of the owner and the public unequivocal in their character, though occurring on a single day." "Long-continued and uninterrupted use of land by the public, however, furnishes strong evidence of a dedication." In the case of *Com.* v. *Bowman*, 3 Pa. St. 203, it is held that: "The foundation of the right of a county to reasonable accommodation for its courthouse and public offices in the great square of the county town is based upon one of the usages of our state which has acquired the consistence of law; and the extent of the right is limited to the single purpose sanctioned by that usage. A county has no inherent right of property in a public square which has been dedicated not to its use only, but to the use of all the citizens of the commonwealth as a public highway over which all have a right to pass without unreasonable let or hindrance. Such public square is as much a highway as if it were a street, and neither the county nor the public can block it up to the prejudice of the public or an individual. Where a building for a court room and public offices was erected on a part of the public square by county commissioners previously to 1800, which was used for the purpose of its erection from that time until 1829, when a new courthouse and offices were erected on another part of the same square, to which the court and public records of the county were removed, and a part of the old building was let by the commissioners at a yearly rent for a printing office, and the rest of it was used as the office of the county treasurer, held, that each of the purposes to which the commissioners appropriated the old building was unlawful, and that the duty of the commissioners required them to remove the materials of the old building, or to abandon them to the muni-

cipal authorities; and by omitting to do so they became obnoxious to a criminal prosecution for a public nuisance." 2 Dill. Mun. Corp. § 644, says: "The doctrine of dedication to public uses has also been extended and applied to public squares in cities and villages, these being regarded as easements for the benefit of the public; and the fact of dedication may be established in the same manner as in the case of highways and streets." And in the note it is said: "The owner of land fronting on a common or public park participates with the public in a beneficial interest therein, and may maintain an injunction to protect his interest. In this case the building of a wall along a highway taking in a part of a public green so as to obstruct the view from complainant's house, was restrained"— citing *Wheeler* v. *Bedford*, 54 Conn. 244 (7 Atl. 22).

Now, when we seek the true intent of the original transaction between Adam Myers and the county court it is found in the order entered by said court on the 24th day of November, 1813, more than eighty years before the institution of this suit, which order reads as follows: "Ordered, William Marteny and William Steer be appointed commissioners to contract with Adam Myers for land to build a jail on and to enter into an agreement with said Myers that the public will put no buildings on the public square unoccupied opposite said Myers House, but it to remain for the use of the public." The intention of that order is plain and unequivocal; and on the next day the said Adam Myers and wife conveyed to said commissioners a lot for the jail for the consideration of one dollar as well as one moiety of the public ground opposite to and in front of said Myers House so far as (that is, to the extent that) said public ground was not to be occupied by public buildings. It seems that neither the court nor said Myers then contemplated that private individuals would ever erect buildings on said square, and so the concluding words of said order provided, "But it (the public square) was to remain for the use of the public;" and if the fee simple of said public square was in the county court, what more complete dedication of the same to the public could have been asked or desired than this order? And then the proof shows that

through all these years that dedication was respected, and as late as July 3, 1891, the county court made the following order: "Ordered, that the jailor be directed to keep the public square free from all obstructions at all times."

We have seen in one of the cases above quoted that a public square occupies much the same relation to the public as a highway or street does. So in the case of *City of Wheeling* v. *Campbell*, 12 W. Va. 36, it was held that, "where a street in Wheeling had been used by the public for more than forty years as a street, it was held to have been dedicated to public use." Again, in the case of *Taylor* v. *Philippi*, 35 W. Va. 554 (14 S. E. 130) it was held that, where W., being the owner of land, surveyed and plotted the same into lots, streets, and alleys, which plat was recorded, and the town named by the legislature, such acts and conduct on the part of the owner constitute *prima facie* evidence of the intent on his part to dedicate such street to public use. An acceptance of such dedication by the proper local authorities may be implied as well as express, such as the recognition of and naming of it as a street of the town by an ordinance of the town council, or any actual appropriation of the property for the use designed. In this connection I call attention to the fact that the order of the county court dated November 24, 1813, as well as the order of July 3, 1895, spoke of this ground as the public square, and the evidence shows that through all this time it was recognized, used, and treated as a public square, was so treated by the county court, and so recognized and accepted by the public; and we must conclude that it was dedicated as such, and, after it has been for so long a time dedicated to the public as a public square, and accepted and used as such, even if there was no such covenant as appears on the face of the deed from Adam Myers and wife to said commissioners, the county court could not divide up said public square, and sell it to private individuals for private purposes.

The decree complained of must be affirmed.