# Richmond.

BOARD OF SUPERVISORS OF FREDERICK V. CITY OF WINCHESTER.

FEBRUARY 2d, 1888.

1. EQUITABLE JURISDICTION AND RELIEF—*Dedication—Square.*—A square was dedicated to the public and used for county buildings and standing for wagons, &c., ever since the formation of the county in 1743, and before the city wherein it lies was incorporated:

HELD:

> Such dedication was for such special purposes only, and a court of chancery will enjoin the city from altering a part of the square.

2. IDEM—*Subsequent conveyance.*—A deed of conveyance made in 1801 under act of 1799, to the justices of the county and the mayor and aldermen of the city, for the said square, did not confer upon the city the exclusive right to direct the uses to which the square should be applied.

Augued at Staunton.  Decided at Richmond.

Appeal from decree of circuit court of Frederick county, rendered in the cause of the board of supervisors of said county, and another, against the city of Winchester and a committee of its common council, dissolving an injunction awarded the complainants to restrain the defendants from altering a part of the public square in said city, and dismissing their bill with costs.  Opinion states the case.

*Harrison & Byrd* and *Wm. J. Robertson,* for the appellants.

*Holmes Conrad* and *Barton & Boyd,* for the appellees.

HINTON, J., delivered the opinion of the court.

This suit was instituted by T. K. Cartmell, a citizen of Frederick county, and the board of supervisors of said county, to enjoin the city of Winchester, and a committee of its common council, composed of George E. Bushnell, Washington South, and T. M. Bantz, from tearing up the stone pavement, removing the hitching-posts, and making certain other radical changes in that portion of what is known in the record indifferently as the "Public Lot," or "County Lots," or the "Public Square," lying east of a line extending from Railroad avenue, or Courthouse avenue, (as it is now called), along the eastern wall of the courthouse and the county clerk's office, to Water street. The defendants both answered and demurred to the bill, and upon argument the demurrer was overruled, and, as we think, rightly. The bill substantially alleges that the county of Frederick has had possession of this square ever since it was constituted a county; that said property has been long used by the county of Frederick for public purposes; that upon it stands the county courthouse, county clerk's offices, and the offices of the clerk of circuit court of said county, and that by virtue of a deed from James M. Marshall, dated June 2, 1801, the county is at least entitled to a joint ownership with the city in said property. It then alleges that the city of Winchester is proceeding to make such radical changes in the *status* of the property that its character will be entirely destroyed, and that irreparable damage will ensue unless the court intervenes, and closes with the proper prayers for an injunction, an account, and further relief. This was sufficient to make a case for a court of equity. It advised the defendants that the county's claim to the property in question rested upon possession and long devotion to public purposes, but that the mere legal title was derived through the Marshall deed. It was tantamount to a declaration that it claimed the property in question by dedication, although it became possessed of the

mere legal title through the Marshall deed, and this, in our judgment was a sufficient statement of the county's title to support its application. It could not be required to set out the evidence on which title rests. 2 High, Inj., 755; *Trustees* v. *Cowen*, 4 Paige, 510.

The answer of the city denies that it claims any interest in said property by virtue of the Marshall deed, and while denying that the city ever proposed to make any radical changes in the *status* of the property, it admits the passage of an ordinance, and the appointment of a committee to have the stone on the Market square, which had been laid there by the council, taken up, and the ground planted in grass and trees, and says its committee were doing only this when restrained by injunction. It rests its claim to determine and direct the uses to which this property shall be applied upon the original dedication, and its right so to treat the ground as to prevent its becoming a public nuisance.

From the historical evidence in the cause, it appears that in 1738, an act of the colonial legislature was passed authorizing the county of Frederick to be carved out of the county of Orange, and providing that " until it shall be made to appear to the governor and council that there is a sufficient number of inhabitants for appointing justices of the peace and other officers, and erecting courts therein for the due administration of justice, it shall remain a part of the county of Orange." And it is fair to infer that the county of Frederick did not acquire the requisite number of inhabitants and become a distinct county until 1743, when the first act of the county court was to order the erection of a jail on the land now in dispute, and from this time until after the execution of the Marshall deed in 1801, it seems perfectly clear that the county court exercised absolute and exclusive control over this property. During all of this period, the only allusion to the town of Winchester to be found in the orders of the county court and in the record of this case, is in 1782, when the county court

upon the application of the said corporation, gave it permission to "erect a pound on the public lot at the back of the goal."

In 1752 (6 Hen. St., 268) the town of Winchester received its village charter, and in 1779, (10 Hen. St., 172) it was incorporated as a town, and was first invested with a market franchise. In 1799, the county court of Frederick, by an order entered at its April term, though reciting that Lord Fairfax had dedicated "a square of lots in the town of Winchester on which the public buildings are erected * * * for public use, but that a legal conveyance for the same hath not been executed, and that James M. Marshall, who now claims under a purchase from the representatives of the said Fairfax, is willing to, execute a conveyance for the same," appointed a committee "to confer with the said Marshall thereupon, and to obtain a conveyance for said lots to the present justices in commission of the peace, and their successors for public use."

In the December following, an act of assembly was passed, which, after reciting that "it hath been represented that James M. Marshall is willing to convey to such persons as may be empowered by the general assembly of Virginia to take a conveyance, all his rights, title, and interest in and to the public square in the borough of Winchester, in the county of Frederick, except that part on which the church stands, and the church-yard annexed thereto," enacted "that any deed of conveyance made and executed by the said James M. Marshall for the public square as aforesaid, to the justices of the county aforesaid, the mayor and aldermen of the borough of Winchester, and their successors, (to and for the use of the said borough of Winchester and county of Frederick,) shall be as good and valid in law as if such conveyance had been made to an individual."

On the second of June, 1801, a deed of conveyance was duly executed in accordance with the provisions of this act to the justices of the county of Frederick, and the mayor and aldermen of the borough of Winchester. During all this

time, commencing in 1743 and ending in 1801, as appears from the records of the county court, the county of Frederick held possession of this square, and during the same period, except perhaps between the years 1779 and 1801, when a small space in the extreme eastern portion thereof was possibly occupied by a market house, it had the sole and exclusive control of the whole property. Since 1801, however, the county and city seem to have usually exercised a several control over the different parts of this property; the city regulating the market until about a year ago, when it ceased to be used and was abandoned, and the county controlling the rest of the square, although there are instances of both county and city uniting in the management of the *locus in quo*, as for instance in subscribing for and laying down the very pavement which is now sought to be torn up. That the county could only have acquired this possession and control by dedication seems also patent. The right of property being in Lord Fairfax, and the act of 1748, authorizing the county courts to purchase two acres of land for the use of their county in the erection of their public buildings, not having then been passed, and the county not being a body corporate able to take a deed, it could only have been acquired by the county by dedication for some public use. And this leads us to inquire into the extent and purposes of the dedication. What was the use or uses to which this property was devoted? It is contended for the appellees that this was a dedication to "public uses" in the broadest and most unrestricted sense of those words, and that the "exclusive power to determine, direct, supervise, and control the manner and extent of the exercise * * * of this public use" devolved upon the city of Winchester as guardian or trustee for the public. If the premise be true, the conclusion would seem inevitably to follow. 2 Smith, Lead. Cas., 191; 2 Dill. Mun. Corp., §§ 645–647.

But is this so? Are the uses here general and unlimited, or are they special, qualified, and limited? This question must

be answered in the light of the acts of the parties as qualified and explained by the situation of the community, and the locality of the place where the grant or appropriation is to be enjoyed. And I cannot doubt but that in a case like this, especial weight should be given to the peculiar circumstances of the country, and the usage of the local authorities as evidence going to show the intention of the dedicator. At the time of the dedication, to use the striking language of one of the learned counsel for the appellants, "two or three houses on the town run constituted the germ of the uncreated Winchester. * * * Washington had not yet built his fort on the hill to protect the pioneers from the Indians, and the unexplored forest furnished all the park the hardy pioneers desired." Lord Fairfax had not, if James Wood had, of which there is no proof, laid out any streets or lots for the future town. A new county was about to be brought into being. All that was required by the situation was a square for the county courthouse, jail, clerk's office, and perhaps other necessary county buildings, and hitching-posts, and standing room for the horses and wagons of the justices, farmers and other persons coming to the courthouse from a distance. And accordingly we find, as we would naturally expect to find, this square immediately subjected to these uses, with the knowledge and acquiescence of Lord Fairfax; for although he lived until 1781, not one word of dissent is heard from his lips, and even the city of Winchester, although it is a circumstance of no great importance, is upon the record as helping to establish the very pavement and hitching-posts which it is now seeking to destroy.

Under these circumstances, the only rational, and, indeed, the inevitable, conclusion must be that this property was intended to be dedicated to the very uses to which it has been appropriated, which are nothing more or less than the ordinary uses to which many of the county courthouse squares in this State are applied. Having reached this point, it only remains for us to say that it is established by the clear and uncontradicted

evidence of all the witnesses who have testified in the cause, that the use of a portion of this square for hitching-posts, and as standing room for wagons, far from being a nuisance, has been a source of benefit to the merchants of that locality, and has enhanced the value of real estate used for business purposes in the vicinity of the square. And as for the act of December 31, 1799, it seems only necessary that we should say that no matter what may have been the occasion of its passage, whether due to the misapprehension of the importance of getting in the mere naked legal title, or to a disposition to give the city a voice in the management of property located in its midst, a part of which it was then using for its market house, it only conferred, in our judgment, a joint ownership in the mere legal title, and could not and did not confer upon the city of Winchester the right to exclusively determine and direct the uses to which this property should be appropriated.

The circuit court therefore erred in dissolving the injunction and dismissing the bill, and its decree must be reversed and annulled, and the injunction must be made perpetual.

DECREE REVERSED.