# CHARLESTON

## RITTER *v.* COUCH.

Submitted February 15, 1911.   Decided October 29, 1912.

1.  CEMETERIES—*Dedications—Public Use.*
    Ground conveyed to an incorporated town, for the use of the town as a graveyard, and dedicated by the town to the public use as such, and so used by the public, is held in trust by the town for the public for burial of the dead.   (p. 223).

2.  SAME—*Conveyance to Town—Trusts—Sale by Town.*
    Ground is conveyed to an incorporated town to be held by it

71 W. Va.

for a burial place for the public. Th town accepts the convey-
ance and devotes the ground to public use for burial, and it is
so used by the public, and many dead bodies are interred
therein. Without legislative authority the town cannot sell
and convey the land and thus disable itself from executing the
trust of maintaining such burial place. (p. 228).

3. CHARITIES—*Charitable Use—Cemeteries.*
   A trust by conveyance of land to an incorporated town for
   public use as a burial place. for the dead is not void because
   of indefiniteness as to the beneficiary. (p. 230).

4. CEMETERIES—*Unlawful Removal—Injunction.*
   Kindred of the dead may maintain a suit in equity to enjoin
   the unlawful removal of the remains of such dead from their
   graves. (p. 223).

WILLIAMS, JUDGE, dissenting).

Appeal from Circuit Court, Kánawhá County.

Bill by George Ritter and others against George S. Couch
and others. Decree for plaintiffs, and defendant Couch appeals.

*Affirmed.*

*Brown, Jackson & Knight,* for appellant.

*Price, Smith, Spilman & Clay* and *Mollohan, McClintic & Mathews,* for appellees.

BRANNON, PRESIDENT:

Charleston was incorporated in 1794 as a town. In 1831
Daniel Ruffner made a deed to the president, recorder and
trustees of Charleston forever "for use of said town as a grave-
yard or a place of interment for said town," a lot of one acre
of ground. The deed contained a covenant that if at any time
the said corporate body should cease to exist, or become in-
capable of holding said lot of ground, then said Ruffner and
his heirs should "stand seized to the use of said town of Charles-
ton or the inhabitants thereof." The deed contained the
covenant that the "parties of the second part for themselves or
successors do covenant with said Daniel, his heirs and assigns,
to keep the said lot of ground, suitably enclosed, and separate
from the other land of the said Daniel." The deed reserved to
Ruffner a small part of the lot as a private cemetery "and as
containing the bones of his parents."

The town took possession under the deed, and enclosed the lot, and allowed its use for a graveyard for the public from 1831 to 1872. It made no sales of lots, nor written permits for burial. The public used it for burial by license from the town. It was the only public burial place owned by the municipality until 1870, when the town established a cemetery in a different location, called Spring Hill Cemetery. In 1872 the old graveyard ceased to be used for burial. Hundreds of bodies in the long space of forty years had been buried in the old graveyard. Some fifty were removed to the new cemetery; but there remained hundreds in the old cemetery, and sleep there yet. Until 1865 most of the dead of Charleston were buried there. The city took no steps to remove them. No one did. It passed no order forbidding burial there. In it were many monuments and tombstones, and some iron railings enclosing some of the graves. After establishing the new cemetery the city still controlled the old cemetery by fencing and cleaning it up; but it suffered it to grow up in briers and brush, and it became in bad condition in appearance.

In 1898 George S. Couch made a proposal to the city council to buy this acre for $1,000.00.

On the 20th January, 1898, the council of Charleston passed an order reciting that the said lot "is not now nor has been for many years nor ever will be again used as a burial ground and is therefore no longer of any use to the said city; and whereas said lot is at constant expense to maintain in presentable condition, and is moreover made a rendezvous for immoral purposes," and reciting the offer of Couch to purchase. The order accepted the proposition of Couch, and directed a deed to him; on the next day a deed was made to him and he paid the $1,-000.00 consideration. In April, 1898, George Ritter, James F. Lewis, Julia E. Petty and Dulce Rowena Laidley brought the present suit against Couch, the city of Charleston and heirs of Daniel Ruffner, for the purpose of annulling the deed from the city of Charleston to Couch, and to declare void the action of the council selling the lot to Couch, and to enjoin them from attempting to remove, transfer or obliterate in any way the graves of the relatives of the plaintiffs. The plaintiffs had for many years been residents of Charleston, and had buried in

the said graveyard many blood relatives, fathers, mothers, sisters and brothers. The case ended in the circuit court of Kanawha county in a decree holding as illegal the sale of the lot to Couch, and vacating the deed from the city to Couch, and enjoining the defendants from removing or attempting to remove or interfere with, or obliterate the graves of the relatives of the plaintiffs, or the stones or monuments marking them.

The right of the plaintiffs to maintain this suit is questioned. It is said that the plaintiffs or their families never purchased any lots in the graveyard, or had any other right beyond a naked license. It is very certain that the city acquired the lot for burial purposes; that it took possession of the lot and enclosed it and controlled it as a burial ground; that it permitted through many years the burial of the dead in it; and thus it is clear that it received this lot and dedicated it to public use for the burial of the dead. Nothing is wanting on the part of the city to show that it consecrated and dedicated the lot for the burial of the dead. The kindred dead of the plaintiffs lie in that old pioneer graveyard under this dedication and consecration. The municipality of Charleston acquired this property for public use, and devoted it to this use, a legitimate public use, as the burial of the dead is indispensable. Land so acquired by a municipality for such purpose and dedicated, is a dedication to a pious and charitable use. *Hopkins* v. *Grimshaw*, 165 U. S. 342; *Evergreen Cemetery* v. *City of New Haven*, 21 Am. R. 643. In the last named case the court said: "All must be regarded alike as consecrated to a public and sacred use. The idea of running a public street regardless of graves, monuments and the feelings of the living, through one of our public cemeteries, would be shocking to the moral sense of the community, and would not be tolerated except upon the direst necessity." These authorities say that the dedication is irrevocable no matter that there is no purchase of lots or grave places. The city allowed entrance to the dead without let or hinderance. It is said, furthermore, as an argument against the right of the plaintiffs to sue, that Couch does not propose to disturb the graves of the dead. Perhaps not now; but he was careful to insert in the deed from the city to him a provision limiting the right of the city or any person to four months from the date of the deed to enter the

lot for the purpose of removing the dead, and declaring that such entry could not be made afterwards. Couch claims that under his deed he has absolute title in fee to the lot unencumbered of any trust, and the right to dispose of it. What is to prevent him or his heirs or alienees at any time in the future from removing the dead? Couch has dry legal title, and if that be not charged with the trust, there is no guaranty that the dead will not be removed, and if the kindred of the dead may not call upon a court to save their last resting places from invasion, Couch cannot be stopped from so doing by any mere declaration of Couch, based on no consideration, the deed containing no covenant not to invade the graves. This commercial age betokens that trade will at some future time forget the dead reposing there. It has been debated in this case as to the character of the deed from Ruffner to Charleston. It has been questioned whether it is a deed with a subsequent condition, or an absolute conveyance of the fee simple without such condition. Does the fact that the lot has ceased to be used for interment, or its transfer by the town, forfeit the estate of the town and revert the land to Ruffner heirs? I cannot see that this question is material. If the town has lost its title, and the lot has reverted, I do not see that it would help the plaintiffs. They would not get title thereby. But it may be material as showing, against Couch, that it is not his power to remove the dead. I do not think that the deed from Ruffner conveys the estate upon condition. I think it conveys an absolute legal title. It mentions no condition of forfeiture. It mentions no forfeiture as long as Charleston is capable of holding. Forfeitures are not favored by equity. It takes very plain language to create a forfeiture in courts of equity. Equity does not enforce forfeiture. I think the principles stated in *Brown* v. *Caldwell,* 23 W. Va. 187, will sustain me in saying that Couch took an absolute fee simple estate, without forfeiture condition. And, therefore, unless that estate, be charged with a trust, Couch could at any time remove these dead.

Can the kindred of the dead interfere for their protection? Can they call upon equity to do so? In *Beatty* v. *Kurlz,* 2 Peters 566, Justice Story said: "This is not the case of a mere private trespass, but a public nuisance going to the irreparable

injury of the Georgetown congregation of Lutherans; and the property consecrated to their use by a perpetual servitude or easement, is to be taken from them; the sepulchres of the dead are to be violated; the feelings of religion and the sentiments of natural affection of the kindred and friends of the deceased are to be wounded; and the memorials erected by piety or love to the memory of the good, are to be removed so as to leave no trace of the last home of their ancestry to those who may visit the spot in the future generations. It cannot be that such acts are to be redressed by the ordinary process of law. The remedy must be sought, if at all, in the protecting power of a court of chancery operating by its injunction to preserve the repose of the ashes of the dead, and the religious sensibilities of the living." The old common law did not recognize the rights of relatives.

In *Wynkoop* v. *Wynkoop*, 82 Am. Dec. 513, we find this note reflective of the law: "By the old English law, the body was not recognized as property, but the charge of it belonged exclusively to the church and the ecclesiastical courts, as did also the administration of estates. So while there was property in the burial lots, in the monuments, and in the ornaments and decorations of the deceased or his grave, there was none in the remains themselves: 2 Bla. Com. 429; note to *Pierce* v. *Proprietors, etc.*, 10 R. I. 237; S. C. 14 Am. Rep. 667; and there are some decisions to the same effect in the United States: *Snyder* v. *Snyder*, 60 How. Pr. 368; *Meagher* v. *Driscoll*, 99 Mass. 284; *In the matter of the Brick Presbyterian Church*, 3 Edw. Ch. 155; for it said that after burial the body becomes a part of the ground to which it has been committed; "earth to earth, ashes to ashes, dust to dust": *Meagher* v. *Driscoll*, 99 Mass. 284. These notions, however, may possibly be borrowed from the ecclesiastical law, and arise from a false and needless assumption in holding that nothing is property that has not a pecuniary value. "The real question is not of the disposable, marketable value of a corpse or its remains, as an article of traffic, but it is of the sacred and inherent right to its custody, in order to decently bury it, and secure its undisturbed repose. The dogma of the English ecclesiastical law, that a child has no such claim, no such exclusive power, no peculiar interest in the

dead body of its parent, is so utterly inconsistent with every
enlightened perception of personal right, so inexpressibly re-
pulsive to every proper moral sense, that its adoption would be
an eternal disgrace to American jurisprudence. The establish-
ment of a right so sacred and precious ought not to need any
judicial precedent. Our courts of justice should place it, at
once, where it would fundamentally rest forever, on the deepest
and most unerring instincts of human nature; and hold it to be
a self-evident right of humanity, entitled to legal protection by
every consideration of feeling, decency and Christian duty. The
world does not contain a tribunal that would punish a son who
should resist, even to death, any attempt to mutilate his father's
corpse or tear it from the grave for sale or dissection; but where
would he find the legal right to resist except in his peculiar and
exclusive interest in the body?" Per Ruggles, referee, in Law
of Burial, 4 Bradf. appendix, 529. Accordingly, it has been
held that, it is a quasi property, over which the relatives of the
deceased have rights which our courts of equity will protect:
*Weld* v. *Walker,* 130 Mass. 523; *Pierce* v. *Proprietors, etc.,* 10
R. I. 227. And in Indiana, a court of law has cut loose all
ecclesiastical ties, and held that the bodies of the dead belong to
the surviving relations, in the order of inheritance, as property,
and to be disposed of as they may deem fit, but subject to such
burial regulations as are reasonable and proper for the public
health and advantage. The burial, however, cannot be taken out
of their hands, they being able and willing to perform it:
*Bogert* v. *City of Indianapolis,* 13 Ind. 134, 140. And further,
a sort of right of custody over the interest in the dead body, in
the relatives of the deceased, is recognized in the statutes of
many of our states: See *Pierce* v. *Proprietors, etc.,* 10 R. I.
239; S. C. 14 Am. Rep. 667, and statutes there cited. The
subject of property in dead human bodies is discussed at length
in 4 Alb. L. J. 56, 57; 6 *Id.* 151-154."

If relatives of blood may not defend the graves of their de-
parted who may? Always the human heart has rebelled against
the invasion of the cemetery precincts; always has the human
mind contemplated the grave as the last and enduring resting
place after the struggles and sorrows of this world. When the
patriarch Jacob was dying in Egypt he spake unto the Israelites

and said: "I am to be gathered unto my people; bury me with my fathers in the cave that is in the field of Ephron, the Hittite, in the cave that is in the field of Machpelah, which is before Mamre, in the land of Canaan, which Abraham bought with the field of Ephron the Hittite for possession of a burying place. There they buried Abraham and Sarah his wife; there they buried Isaac and Rebekah his wife; and there I buried Leah." Genesis 49, 29. Jacob regarded the grave as the never ending resting place of his kindred. Ever since those distant days so has felt the human heart. Everything else has changed, but that sentiment remains steadfast today. For the proposition that relatives may invoke the arm of equity against desecration of graves in dedicated burial places it may be useful for future use t ocite also *Boyce* v. *Kalbough,* 28 Am. R. 464; *Davidson* v. *Reed,* 168 Ill.; *Mitchel* v. *Thorn,* 30 Am. St. R. 699; *Roussear* v. *City,* 49 How. Pr. 492; 1 Spelling Ext. R., sec. 347; 3 Am. Eng. Ency. of Law 53. *Tracy* v. *Bittle,* 213 Mo. 302, 15 Ann. Cases, 167, is a notable case for this purpose. Mary, the mother of Washington, was buried by her son-in-law upoñ his property. Her grave was neglected for forty years, then a monument was erected over it. In 1888 parties attempted to sell her grave. The court held that its sale was void. *Colbert* v. *Sheppard,* 16 S. E. 246; 89 Va. 401.

When once property has been dedicated for a special purpose, as for a burial ground, or where a city has dedicated it for that purpose, and persons have acted upon the faith of such dedication by burying their loved ones there, the city cannot devote the property to any other purpose. Tiedeman on Munic. Corp., sec. 229. See sec. 222. "It is manifest that a municipal corporation has no implied authority to dispose of lands which have been dedicated to it for public benefit; nor would such property be subject to sale for the payment of debts of the municipal corporation. Lands which are dedicated to the public use, are not even alienable, when on account of surrounding circumstances they become unsuitable for the use for which they were dedicated." Only the legislature can authorize municipalities to dispose of them. Think of a lot conveyed to a town for the purpose in the minds of grantor and grantee both of its use as a burial place. The grantor having already buried the bones

of his ancestors, the lot used for so many years for burial, and practically filled up with hundreds of graves, intended by both grantor and grantee to be so used; dedicated by the municipality for this purpose to the public and used by the public; then think of the municipality selling it to a private individual by a deed conferring upon him right to remove the dead; for he claims absolute property, as the record shows. It strikes us at once that the city has no power to pervert the ground to another use than that contemplated by the grantor and city. It defeats the intent of both. This is shown by the clause in the deed providing that if the town should become incapable of holding the lot, it should go back to Ruffner, but still be subject to graveyard purposes. In *Pence* v. *Bryant*, 54 W. Va. 263, we held that when land has been dedicated to public use and accepted by the public by long use, as the street, the town cannot divert it to another use without legislative authority. See *Warren* v. *Lyons*, 22 Iowa 351; *Mount Hope* v. *Boston*, 158 Mass. 509; *Board* v. *Winchester*, 84 Va. 467; *Benn* v. *Hatcher*, 81 Va. 25. Mc-Quillin on Munic. Corp., sec. 1141, says: "Property devoted to a public use cannot be sold without special statutory authority, although property which has ceased to be used, or is not used, by the public, may be sold or leased as the public welfare may demand. For instance, property dedicated for public use as a common, or property conveyed to be used as an ornamental park only, except where authorized by statute, cannot be sold. In this sense all property is public which has been dedicated to public use, or which may be affected by a public trust, either general or special. Municipal corporations hold all property in which the public is interested, such as streets, alleys, public squares, commons, parks and wharves, in trust for the use of the public, and on principle, such trust property can no more be disposed of by the municipality than can any other trust property held by an individual." In a note found there we find this: "It may be seriously questioned, whether, after land has been appropriated to public uses it can be transferred unconditionally to another for private use." The authorities are against such right. The power of sale is not incident to the ownership of property held as a public trust. *Roper* v. *Mc-Whorter*, 77 Va. 214; *Smith* v. *Cornelius*, 41 W. Va. 59.

Authorities above show that when the purpose for which land is conveyed or dedicated has been accomplished, or that the use intended can no further call for it, the property may be sold. But that doctrine can have no possible application in this case; for who can say that a graveyard filled with dead bodies, so that there is no room for any more, or where it is disused, is no longer a graveyard? It is just as plainly continued a graveyard for the repose of the dead that lie in it through centuries ahead. Its purpose will never cease to call for such use. For this I cite *Tracy* v. *Bittle*, 213 Mo. 302, reported in that valuable late work 15 Ann Cases, 167, 173. In the latter volume will be found much valuable law upon the subject of dedication of land for cemetery purposes. We find law to show that there has been no abandonment in this case. The city has never forbidden interment therein, and has continued to care for it as a cemetery to an extent.

The act of the city in selling this lot to Couch cannot be justified on the ground that the lot was a public nuisance. There is no evidence of this, and it is to be remembered that the city never declared it to be a nuisance, or ordered or forbade its use for burial, or ordered disinterment of the bodies therein. That a cemetery *per se* is not a nuisance is supported by many authorities. *Kingsbury* v. *Flowers*, 39 Am. R. 14; *Lake View* v. *Rose Hill Cemetery*, 22 Am. R. 71; *Dunn* v. *Austin*, 77 Texas 139. The briers and weeds grew up in it. What of that? The blackberry's flower is as sweet to the dead as any. The weed, though so called, spreads "its perfume on the desert air." They too are nature's tributes to the dead.

> "Above the graves the blackberry hung
> In bloom and green its wreath,
> And harebells swung as if they sung,
> The chimes of peace beneath."

So sings Whittier in "The Old Burial Ground." As to its use for immoral purposes. A fence and locked gate would obviate that. And where the police?

In what I have said above I have assumed that the town held the lot charged with a public trust. The authorities above go to establish this. It is well established that a town can accept a dedication of land for public purposes. *Boughner* v. *Clarksburg*,

15 W. Va. 394; *Sturmer* v. *County Court,* 42 W. Va. 724.   The Code, ch. 47, sec. 28, gives a town power to provide places for the burial of the dead.   Certainly such power is essential.   But it is said that this trust, whether arising from the Ruffner deed to the town, or from dedication by the town, is a void trust, because of uncertainty in the beneficiary, it being without specifications of the persons to receive its benefits, except to the general public of Charleston and its vicinity.   We do not deny the proposition that in a private trust there must be a definite beneficiary; but how as to the trusts for the general public?   It is impossible to name those who might in future be buried in the lot.   Is the trust to fail for that cause?   In Beach on Trusts, sec. 322, we find this: "In distinction from an express private trust, which, by the definition, is designed for the benefit of one or more individuals, the trust for charitable purposes is a public trust, and from the nature of the case the beneficiaries are, to a greater or less extent, unknown or indefinite.   Ordinarily the trust is designed for the benefit of a class, the individuals of which can be designated only in general terms.   In a private trust, if the beneficiary or beneficiaries are not definitely and positively named, the trust fails on the ground of indefiniteness. But in a charitable trust the beneficiaries need not be definitely named, and even where there is no adequate designation of a *cestui que trust,* the trust will be enforced in equity if the intention of the settlor can be ascertained beyond a reasonable doubt.   Trusts for charitable purposes are regarded by courts of equity with special favor, and a much more liberal construction will be put upon an instrument creating such a trust than upon one creating a trust for individuals."   That seems to me to be a reasonable proposition.   Here is a town owing duties to the public, organized to advance the public interest; it receives a conveyance for a burial place.   Is it possible that it can fail for want of specification of those who may come to be buried in it?   The town can take property to hold in trust, as street or park or a city hall.   Does its deed have to name thousands that are to be beneficiaries, those composing the general public?   Why cannot the town, on like principles, receive in trust ground for cemetery purposes?

Great reliance is placed by the defendants on the case of

*Brown* v. *Caldwell,* 23 W. Va. 187, holding void for want of certainty in the beneficiaries a deed for land to a trustee upon trust that the trustee should at all times permit all the white religious societies of christians, and members of such societies to use the land as a common burying ground, and for no other purpose. That case would seem to have been inspired by such cases as *Carskadon* v. *Torryson,* 17 W. Va. 43. I draw distinction between the *Brown-Caldwell* case and our case. There the trust was for only members of certain religious societies, and of one race, and was impossible to ascertain them; but in our case the trust is for the general public. The trustee is a town charged with the duty of holding for the general public impossible to be further specified. We have a statute making good a conveyance to trustees for churches and burial ground purposes, though no names be given, because impossible, and we ought to uphold a conveyance to a town upon trust to use for burial purposes. Both by the Ruffner deed to the town and its dedication for burial purposes the town held the land subject to the trust. It seems to me that the conveyance was to the town as a corporation and for its own corporate purposes, because a cemetery devoted by it to public use is just as much for corporate or public purposes as the ground for a street or park. It seems to me that there are not both a trustee and another person as *cestui que trust,* but that the town is both. The case of *Jordan* v. *Universalist Trustees,* 107 Va. 69, holds that: "While the courts of chancery of this State will not undertake to enforce indefinite charities, a devise to a corporation for the general purposes of its incorporation cannot be said to be uncertain in any respect, and will be upheld." It seems to me that is a sound proposition. The statute of charitable trusts, in the reign of Elizabeth, is not a statute law in this state, as I admit. That statute was passed to make good conveyances to pious uses, not otherwise good, and that statute was repealed by Virginia in 1792. Many of our states hold good conveyances by analogy to that statute, treating it as common law. If we consider that the public in this case is not the same as the municipality, the trust ought to be held good on the ground that the use is for the public—a grant to the corporation for public purposes. I understand the law to be that a grant to a corporation, which is

capable of taking, which grant is for public purposes, is good though individual beneficiaries are not named. "In charitable trusts the beneficiaries are not and need not be capable of taking the title, as when property is given in trust for the poor of the parish, or the education of youth, or for pious uses, or for any charitable purpose, the beneficiaries are generally unknown, uncertain, changing and incapable of taking or dealing with the legal title; but such trusts are valid in equity, and courts of equity will administer them and protect the rights of the *cestui que trust."* Perry on Trusts, sec. 66. I know that this text may be said to be based on the statute of charitable trusts, not enforced in Virginia; but I repeat that a public corporation, like a town, may take property for public use without designating the thousands composing the public now and hereafter. Is it possible that such a trust is void  Now, it has been a serious question in the English courts, and in the American courts, whether, before or without the statute of Elizabeth, charitable trusts would be enforced in equity. A discussion of this subject will be found in Perry on Trusts, sec. 693. It was gravely considered in the Supreme Court of the United States in *Vidal* v *Girard,* 2 Howard 196; the conclusion seeming to be that equity exercised this jurisdiction before and outside of the statute in many cases. But I do not rest the case on that consideration. I am here asserting that a public corporation like a town may take land to execute public purposes, declared in the deed or dedication to be held for public purposes, without specification of the members of the public. I say that a town incorporated can take land upon a trust to hold for the general public, as for instance, for a street, park, a burial place. Indeed, as above suggested, I do not know that we can say there is an indefinite beneficiary in this case. I regard it as a conveyance to the incorporated town for its own public use, needing no names of those constituting the public.

So we do not think the town had capacity to sell this graveyard ground. Charged by the deed from Ruffner with the duty of holding for burial, charged by its own act of dedication to that use for many, many years, by its sale to Couch it disowned and abdicated its trust for the use of a private individual, which we said it could not do in *Pence* v. *Bryant,* 54 W. Va. 263. By

this sale it was not furthering public weal but private interest. The deed to Couch contemplated the appropriation of the ground to purposes other than burial, because it provided for removal of the dead in short order, giving a license to do so of only four months. It is useless to cite authorities for the rule that a municipal corporation must have legislative authority for such acts as this. Certainly it cannot be justified by any implied authority. Dillon on Munic. Corp., sec. 1102, says: "A municipal corporation has no implied or incidental authority to alien, or dispose of for its own benefit, property dedicated to or held by it in trust for the public use or to extinguish the public uses in such property." It will there be seen that there has been serious question whether even the legislature can authorize a town to dispose of property held for an important public use. We need not decide that question as there has been no special act. I think, speaking only for myself, that the Legislature has such power. 14 Ann. Cases, 1080. We hold that without such authority the city of Charleston could not abdicate its public function as to this old pioneer graveyard, this "God's Acre."

These views lead us to affirm the decree.

*Affirmed.*

WILLIAMS, JUDGE, (*dissenting*):

I realize that the preparation of dissenting opinions is generally a work of supererogation; and yet, when I am unable to agree with my associates, I think a proper regard for their opinions, as well as a decent respect for my own, affords sufficient excuse for the needless labor. The parties to a suit and their counsel are entitled to the several opinions of the judges, when there is want of concurrence.

While I have a very high regard for the opinions, generally, of my associates, and especially for the opinions of the judge who wrote the opinion in this case, because of his wide knowledge of the law and long service on this Court, still I am so thoroughly convinced that this decision is contrary to all the law applicable to the case, that I can not yield my own judgment, not even to so eminent a judge as he. Each judge arrives at his own conclusion, after a careful examination of the law, and it is, there-

fore, to be expected that all five of the judges will not at all times agree; continuous harmony in the judgment of many judges is a certain evidence that some of them lack faith in their own opinions.

There is no controversy as to the facts in this case; they are set out in a written agreement signed by opposing counsel. That the council met at night and, by resolution, closed the deal with Mr. Couch, is not material. There is not a particle of evidence of fraud. It is common knowledge that such meetings are as often held at night as in the daytime. Mr. Couch's good faith is shown by the fact that he had asked the council at other times to convert the lot into a park; and that he had, years before, submitted a written proposition to buy the lot and remove and re-inter the remains of the dead, on certain terms. There is no question of fraud before this Court.

I agree that the relatives of the dead have such an interest in their remains as will entitle them to resort to equity, if necessary, to prevent the unlawful disturbance of their graves; but I deny that any such case is here presented by the facts; there is no evidence that Mr. Couch was interfering with the graves, or that he was about to do so. He would have been liable to criminal prosecution if he had done so. without first obtaining authority from the proper source. On the contrary, the agreed fact is, that the graveyard was in better condition when this suit was brought than it had been for twenty years before. Further than the right to have the graves of their relatives protected from unlawful molestation, the property right of each citizen of Charleston in the lot was the same; the right of one was not superior to another.

The principal question in the case concerns the city's power to control the use, and to make disposition, of the graveyard; other questions arising have more or less bearing upon this one, but they are only incidental to it.

I freely confess that, when this case was argued orally, more than a year ago, I received impressions which strongly inclined me to the view that the city had not the right, or power, to dispose of its title to ground which it had bought for burial purposes, and in which many bodies yet remained. It is a case that appeals strongly to one's sentiment and feelings; and, when

I began to examine the law bearing upon it, I did so with a prejudice against the right claimed by the city. But, as I proceeded in my investigation, I found my prejudice gradually yielding to the higher authority of reason and law, until at present I have not the faintest doubt in regard to the city's right to sell the lot. But what use Mr. Couch can make of the lot, while the dead remain buried in it, is not for me to say; nor is that question presented to us. He may have a piece of property that is useless to him; but that is his own concern, and he is not complaining. Certain it is, that the criminal statute protects the graves against unlawful molestation, no matter whose land they are on.

The council of the city is given power under its charter to "purchase and hold or sell real estate and other property necessary to enable them the better to discharge their duties and needful for the good order, government and welfare of the said corporation; * * * to abate or cause to be abated anything which in the opinion of the council shall be a nuisance; * * * to provide in or near the city places for the burial of the dead, and to regulate interments in the city; * * * to promote the general welfare of the city and to protect the person and property of the citizens therein." Is it possible that under such broad powers, the city can not dispose of its title to the lot in question, in the interest of the general welfare of the city, but is bound to keep it, regardless of its location, condition and its present surroundings, notwithstanding the council has long since provided a more beautiful and commodious cemetery, on the hill overlooking the city, sufficient to accommodate the remains of those who are now buried in the old graveyard as well as the bodies of those who may die in many years yet to come? I can not so believe. I think the charter powers of the city were intended by the legislature to meet the exigencies of just such a case as this.

No limitation is put upon the city's right to dispose of the lot by the terms of the Daniel Ruffner deed. Then, whence the limitation? The opinion admits that the deed conveyed an estate in fee absolute. There is clearly no declaration of trust in the conveyance. Wherefore, then, deny the city the *jus disponendi*, a right incident to all estates held in fee? The city

paid $300 for the land, and Mr. Ruffner granted it in consideration thereof. It was, therefore, not a dedication by him. A grant for a valuable consideration, and without conditions, can not be a dedication; to say so is a contradiction in terms. The recital that the city had purchased the ground for its use, as a graveyard, did not create a trust, nor did it oblige the town to devote it to that use; it had the right to make any other use of it that, in the judgment of the council, the city's welfare might require. The recital is not even a covenant by the city that the land will be so used. It is no more than if a grantee of a lot of ground should say that he was buying it to erect on it a hotel. That would not estop him from building a dwelling house instead.

The opinion contains a very elaborate disquisition on the question of a dedication of land to a pious use. But I can not see that that question has any application whatever to this case. I think I have shown that Mr. Ruffner did not dedicate the ground in any sense of the term; and I think it is a use of the term, unwarranted in law, to say that the city dedicated it; the city simply used it for a particular purpose. But, let it be admitted that the city did, in a certain sense, dedicate the ground to a particular use; the question then arises, to whom did it dedicate it? The deed by which it took title answers that question; it says that it was "for the use of said Town as a Grave Yard, or place of interment, for the said Town." Who constituted the town, now the city of Charleston? Its citizens. So that, the only dedication the town could, or did, make, was a dedication to itself. It was not authorized by its charter to buy land for any other uses than its own. If it held the property in trust, it held it in trust for itself, just as it holds any other land necessary for the performance of its governmental function. If it was trustee, it was also *cestui que trust;* and the union of beneficial interest and legal title in the same individual, or corporate body, certainly confers the right of control—the *jus disponendi.* Deferentially speaking, I think the opinion presents a confusion of ideas, originating in the conception that the city is a trustee holding legal title for the benefit of its citizens in their individual capacity. But their property rights are not individual and distinct; they are only such as exist be-

cause of their citizenship in the organized society composing the municipality. A city can own no private property, all its property is held in public trust. It is created for governmental purposes; and is a subordinate political division of the state; it exists, owns property and exercises the powers and rights given by its franchise, for the benefit of all of its citizens. But, like other organized governments, it speaks the will of its citizens through their chosen representatives—the city council. Being chartered solely for a governmental purpose, a municipality can not make an irrevocable dedication of its property to a particular use; because to do so, would be to surrender its governmental authority, *pro tanto.*

None of the cases cited in the majority opinion, on the question of dedication, deal with the point presented by the facts of this case. They all relate to dedication of land by individuals, or by private corporations, to a public use. But even then, the authorities all hold that the use is subject to the governmental control of the municipality, but that, on the cessation of the use, the title to the land dedicated reverts to the former owner or his heirs. In the present case, the city, holding the absolute title in fee, would continue to hold it after the use to which the land had been put had ceased.

There was no grant by the city to any of its citizens for burial plots. The right of interment was a right in common to all the citizens of the city, and amounted only to a mere privilege, or license, revocable at the will of the municipal authorities.

"The right of burial in a public cemetery is not an absolute right of property, but a privilege or license to be enjoyed so long as the place continues to be used as a burial ground, subject to municipal regulation and control, and legally revocable whenever the public necessity requires it." *Page* v. *Symonds,* 63 N. H. 17. See also, *Went* v. *M. P. Church,* 87 N. Y. 266; *Ex parte McCall,* 68 S. C. 489; *Richards* v. *Northeast Protestant Dutch Church,* 32 Barb. 42; *Price* v. *Methodist Church,* 4 Ohio 515; *Sohier* v. *Trinity Church,* 109 Mass. 1.

The opinion admits that the legislature can authorize the city to dispose of the land, but I assert that it has already done so. The city bought it under the power conferred on it by the

legislature, and the power given it to sell and convey is equally explicit.

A statute authorizing a municipality "to pass by-laws respecting the health, good government, and walfare of the place," has been held to confer power to discontinue the use of a burial place in the city. 2 Dillon on Munic. Corp., sec. 682, and cases cited in note 1.

The power "to make regulations to secure the general health of the inhabitants and prevent and remove nuisances," was held, in *Campbell* v. *City of Kansas,* 102 Mo. 326, a sufficient grant of police power to authorize the prohibition of burials and the discontinuance of a graveyard in the city; notwithstanding the city did not own the graveyard.

In *People ex rel Oak Hill Cemetery Association* v. *Pratt et al.,* 129 N. Y. 68, it was held that the charter of the City of Rochester, which gave it power "to make, modify and repeal ordinances and by-laws to regulate the burial of the dead," was sufficient to authorize the city to forbid the burial of the dead in lands of a cemetery association within the city limits, notwithstanding the city had previously given the right to the association to so use its land.

*Presbyterian Church* v. *City of New York,* 5 Cowen 538, is very much in point. The city of New York had there conveyed the lands to the church for a cemetery, and had covenanted for quiet enjoyment; and afterwards, pursuant to power given it by the legislature, passed a by-law prohibiting the use of the lands as a cemetery, and the church brought an action for an alleged breach of the covenant. The court held that the discontinuance of the graveyard did not create a breach which entitled to damage, but was a repeal of the covenant for quiet enjoyment; also, that a municipal corporation could not, by contract, abridge its legislative power. There the city's charter authorized it to pass by-laws "for regulating, or if they find it necessary, preventing the interment of the dead within the said city." That decision was later approved and followed in *Coates* v. *Mayor, etc. of New York,* 7 Cowen 585. In the latter case it was held, also, that the by-law need not recite on its face that it was necessary, but that the necessity was implied by the act of passing it; and that *necessity* meant "what is necessary for

the public good." The city there owned the land and granted it in trust for burial purposes, and it had been so used for more than a hundred years; but notwithstanding, the court held that it "was not conclusive against the power of the legislature, or the corporation, to pass the laws;" and that the city was not prevented from declaring the use "a public nuisance."

In *Kincaid's Appeal,* 66 Pa. 411, which seems to be a leading case on the subject, Judge Sharswood, on page 423, says: "We can not doubt that it is competent for the legislature to authorize or to delegate that power, (*i. e.* to discontinue a cemetery and to remove the remains of the dead,) to the municipalities. It is a police power necessary to the public health and comfort. As they can authorize the removal of any other thing which they deem a nuisance by a summary proceeding, without a jury trial, so they can authorize and direct the removal of dead bodies from any ground, and the consequent vacation of it as a burial ground." In that case, however, there was a special act of the legislature of Pennsylvania, providing for the discontinuance of the burial ground, and the removal of the dead; so, also, there was a like special act by the West Virginia legislature in the case of *Brown* v. *Caldwell,* 23 W. Va. 188. But special acts in those cases were necessary for the reason that the cities did not own and control the respective properties. In the Pennsylvania case the land was owned by a church which had granted burial lots to individuals; and in the West Virginia case the land had been granted to trustees upon a trust not for the city.

That the city passed no ordinance discontinuing the use of the graveyard, or declaring it to be a nuisance, can not affect the case. Such a resolution was not a condition precedent to its power to convey the land. Its use as a burial place had been practically discontinued; no one had been buried in the lot since 1872, and no care was taken of it. The deed to Couch, of itself, operated to discontinue the use, and a formal declaration of such discontinuance was not necessary. The city had provided a new burial place for its citizens, and thereafter bestowed no care upon the old graveyard; non-user and neglect by the city to care for it, for nearly thirty years, was certainly sufficient notice to the friends of the dead buried there that the city had ceased to maintain it as a cemetery. Many persons

had already removed their dead to the new cemetery; and the city ought not to be required to maintain more cemeteries than are necessary for the purposes of interment. The resolution, passed at a regular session of the common council, accepting Mr. Couch's proposition and instructing the mayor to execute to him a deed, was, in effect, a resolution discontinuing the use as a burial place. No previous notice of such a resolution was necessary, because no one had a right to prevent its passage; it was a governmental act, done in the exercise of a delegated legislative power. It is shown by the agreed facts, that since the incorporation of the city no fewer than five different graveyards existed in the city at different times, all of which have been discontinued. As the city grew and expanded, the little burial ground became surrounded with elegant homes, and the council no doubt considered that the welfare of the people required that it be discontinued as a burial place; and the exercise of their governmental discretion in that regard is not subject to judicial review. The lot belonged to the city, and no previous action expressly discontinuing its use as a graveyard was necessary to enable it to convey it.

As cities grow in size and increase in population, it is a prevailing custom to discontinue old burial grounds, and to establish others in more desirable localities, remote from densely populated districts and away from the turmoil of business. The city is not required to justify its action in selling its own property; but if it were, it could no doubt do so on two grounds; first, that it had provided for its citizens another and a better place for interment, to which they had a right to remove the remains of their friends from the old graveyard, and had, therefore, performed its full duty in the premises; and second, that the old graveyard was so sadly neglected, and so much frequented for immoral purposes, that it had become a nuisance. The charter gives the council the right "to abate or cause to be abated anything which, *in the opinion of the council,* shall be a nuisance." *Wood* v. *City of Hinton,* 47 W. Va. 645; *Baumgartner* v. *Hasty,* 100 Ind. 575; *Hart* v. *The Mayor,* 3 Paige Ch. Rep. 213; *North Chicago City Ry. Co.* v. *Town of Lake View,* 105 Ill. 207; 2 Dillon on Munic. Corp., sec. 689. But the power to declare a thing a nuisance, is given to enable the municipality to compel a private owner of property to change

the use which he is making of it, when the use is an annoyance to the public. Such formal declaration is useless when the city owns and controls the property constituting the nuisance. But, it is insisted that a graveyard is not *per se* a nuisance. That may be true; still the council are authorized to declare a thing to be a nuisance, within reasonable limitations, which is not such *per se;* and, in such case, their action is not subject to judicial review; because it is the performance of a governmental function, for the promotion of the general welfare. 2 Dillon on Munic. Corp., sec. 689 ; and authorities above cited. Furthermore, a thing which is not a nuisance, under certain surroundings, may become such at a later time and under different surroundings. A building which was not a nuisance when first erected may become such through its neglect and decay, or by the use made of it; so too, a graveyard located in the heart of a city, and surrounded by beautiful residences may, by simple neglect, become so overgrown with weeds, brush and briers, and may be so used as to justify the municipal authorities in declaring it to be a public nuisance, even when the city is not the owner of the ground, not because it may endanger the health of the community, but because it affords a convenient retreat, nearby one of the public streets, for immoral purposes.

But, it is suggested that the city council had no right to neglect the ground and suffer it to become a nuisance. A complete answer to this argument is the fact that the city had provided another cemetery, and desired to discontinue the use of the old one. It was not obliged to maintain more cemeteries than were needed. The relatives of the dead buried in the old graveyard had the privilege of removing their remains to the new cemetery; many of them did so ; and thereafter no interments were made in the old one.

The municipal authorities, and the purchaser are charged with making commerce of the bones of the dead. But, is it not evident that the bodies interred there detracted from, rather than added to, the commercial value of the lot? Is a man forbidden to dispose of his land because he has permitted his neighbor to bury his dead in its soil? Certainly not. By permitting the citizens to bury their dead in the lot, the municipality did not dispose of any of its property rights, or relin-

quish any of its police powers to control its use.  The citizens had only a permissive right, a mere license to occupy the ground for the burial of their dead, until such time when the city might elect to make other use of it.

Would it not be more in accord with the sentiment, so eloquently spoken of in brief of counsel, if the friends of those who sleep in the old graveyard should wish their remains removed to the new cemetery overlooking the city, where their final abodes could receive respectful attention and care, rather than that they should be allowed to repose forever in a place so much neglected that it had become a rendezvous for crime? If land, once devoted to burial purposes, could not thereafter be used for any other purpose, it would not be many centuries until the face of the earth would be wholly occupied by the dead, and there would be no place for the living.  So, while it is true that the law does have tender regard for the sentiment of the living for the dust of their dead, and protects their graves from unlawful desecration by punishment, as for a crime; still it acknowledges the earth as the only habitation for the living, and gives them a superior right to the soil.

I have shown, I think, that the right of interment was not a property right, but a mere license, or privilege, revocable at the will of the city.  That being so, it follows, as certainly as the night follows the day, that no one who has used the privilege has the right to refuse to remove the remains of his dead and thereby prevent the city from disposing of its property. The city did not bury the dead; wherefore, then, its obligation to remove the bodies, before being allowed to sell its ground? It permitted the burials, and it likewise permitted the removal of the dead, from the year 1872 down to the making of the deed to Couch, and four months thereafter, a period of more than twenty-five years.  Was not that sufficient time for any one, who desired to do so, to remove and re-inter the remains of his relatives?  It would certainly seem so.  "Once a grave yard always a grave yard," may be a prevailing sentiment, and it may have been also the law of Canaan in the days of patriarchal government, four thousand years ago; but it is certainly not the law of our land, or of our time.  I would not willingly offend the sacred sentiment with which we all regard the dust

of our dead; but, I ask, what means the language found in the burial rite of all christian denominations, "earth to earth, dust to dust, ashes to ashes," if the body is to be forever preserved? And if it it is not to be forever preserved, why then should the spot of ground in which it rests be forever hallowed, and withheld from occupation; and, if not withheld forever, then how long? Thomas Campbell is just as eminent authority, in law, as our own beloved Whittier; and from him I quote the following:

> "What's hallowed ground? Has earth a clod
> Its maker meant not should be trod
> By man, the image of his God.
> Erect and free,
> Unscourged by Superstition's rod
> To bow the knee?"

The general public will have small interest in the graves, and in the monuments erected over the final resting place of most of us; and the surviving friends of those who die need no glittering shafts, or eloquent inscriptions, to remind them of their loved ones, for the tie of kinship endears the memory, and "to live in hearts we leave behind is not to die." The embalmed bodies of Egyptian kings and nobles, buried three thousand years ago, are now exhibited in the museums of the country, as curios. If we could discover that lost art, would we practice it? I hope not. I rather think we are gradually losing our prejudices and finding our senses; and will realize, before many generations, that cremation, a much more sanitary method of disposing of the dead, can be made just as sacred a rite as burial.

The covenant by Daniel Ruffner and his heirs to stand seized of the lot "to the use of the said town of Charleston or the inhabitants thereof," in the event the town should become incapable of holding the title, was made for the benefit of the municipality, and was intended to prevent a failure of title, in case the municipality should forfeit, or lose, its franchise. It does not affect the city's title, or limit its power to make disposition of the lot. The covenant was made to meet a contingency which appears never to have arisen.

The fact that Daniel Ruffner excepted from the operation of his deed the plot of ground 35x45 feet within the bounds of the

one acre lot, evinces no intention to create a trust relation between him and the city, but rather shows a contrary intention; for, if he understood that the ground was always to be used as a graveyard, and could not be disposed of by the city, there would have been no occasion for him to reserve the legal title to that lot; he could have protected the graves of his parents and also provided a resting place for himself, by reserving the use only, of that lot. It was a matter of little concern who held the legal title, if the use was to be perpetual.

Law is not an exact science, but a thing of growth and development. Its aim is to do justice; but, as man himself is fallible, it follows that the institutions which he has established for the guide and government of society often fail to accomplish the end desired; but that is no reason why he should not continue his efforts to improve them. Men of the legal profession fully understand that the great body of our law is court-made; that is, it originated in judicial decisions which have come down to us through the centuries. The legislature has made only a fractional part of the law by which society is regulated, and under which its members transact business, one with another. Therefore, when the courts of the present day undertake to interpret and apply what is known as the unwritten law to the facts in any given case, they should do it so as to meet the needs of the complex and highly organized society of the present, so far as this can be done with consistent respect for well established rights and principles. I am convinced that the Court, in reaching its conclusion in this case, has not only refused to be guided by the present needs of society, but has overridden the recent interpretations of the law, respecting such cases, made by the highest courts of every state in the Union that have spoken on the subject, and has taken a most wonderful backward stride; all of which I regret exceedingly.

I would reverse the decree and dismiss the bill.